## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

JILL KUCHARSKI,            :
                                     :
              Plaintiff       :      No. 3:14-CV-1956
                                       :
           vs.                 :      (Judge Nealon)
                                       :
CAROLYN W. COLVIN, Acting   :
Commissioner of Social Security,   :
                                     :
            Defendant     :

## MEMORANDUM

On October 8, 2014, Plaintiff, Jill Kucharski, filed this appeal[1] under 42

U.S.C. § 405 for review of the decision of the Commissioner of Social Security

denying her claim for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 400-403.  (Doc. 1).  The parties have fully

briefed the appeal.  For the reasons set forth below, the decision of the

Commissioner denying Plaintiff's application for DIB will be affirmed.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB on June 16, 2011.  (Tr.

_____

1. Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2. Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits.  A protective filing date allows
an individual to have an earlier application date than the date the application is

30).[3]  This claim was initially denied by the Bureau of Disability Determination

("BDD")[4] on October 4, 2011.  (Tr. 30).  On November 3, 2011, Plaintiff filed a

written request for a hearing before an administrative law judge.  (Tr. 30).  A

hearing was held on November 6, 2012 before administrative law judge Michele

Stolls ("ALJ"), at which Plaintiff and vocational expert, Carmine Abraham

("VE"), testified.  (Tr. 30).  On February 4, 2013, the ALJ issued a decision

denying Plaintiff's claims because, as will be explained in more detail infra,

Plaintiff's impairments did not meet or medically equal any impairment Listing

and Plaintiff could perform a full range of work at all exertional levels with non-

exertional limitations.  (Tr. 32-35).

On March 1, 2013, Plaintiff filed a request for review with the Appeals

Council.  (Tr. 25).  On August 12, 2014, the Appeals Council concluded that there

was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).  Thus,

the ALJ's decision stood as the final decision of the Commissioner.

---

actually signed.

3.  References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on December 22, 2014.  (Doc. 6).

4.  The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

Plaintiff filed the instant complaint on October 8, 2014.  (Doc. 1).  On

December 22, 2014, Defendant filed an Answer and Transcript from the Social

Security Administration ("SSA") proceedings.  (Docs. 5 and 6).  Plaintiff filed the

brief in support of her complaint on December 29, 2014.  (Doc. 7).  Defendant

filed a brief in opposition on January 26, 2015.  (Doc. 8).  Plaintiff did not file a

reply brief.  The matter is now ripe for review.

Disability insurance benefits are paid to an individual if that individual is

disabled[5] and insured, that is, the individual has worked long enough and paid

---

5.  To receive disability benefits, the plaintiff must demonstrate an "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

social security taxes.  The last date that a claimant meets the requirements of being

insured is commonly referred to as the date last insured.  It is undisputed that

Plaintiff meets the insured status requirements of the Social Security Act through

December 31, 2016.  (Tr. 32).

Plaintiff was born in the United States on December 17, 1968, and at all

times relevant to this matter was considered a "younger individual"[6] whose age

would not seriously impact her ability to adjust to other work.  20 C.F.R. §§

404.1563(c); (Tr. 171).

Plaintiff obtained her high school diploma, completed one (1) year of

college, and can communicate in English.  (Tr. 173-174).  Her employment

records indicate that she previously worked as a certified nurse's aid and a

customer service representative.  (Tr. 198).

The records of the SSA reveal that Plaintiff had earnings in the years 1983

through 2008 and 2010 through 2011.  (Tr. 152).  Her annual earnings range from

a low of four hundred eighty-six dollars and eighty-two cents ($486.82) in 1984 to

---

6. The Social Security regulations state that "[t]he term younger individual is used
to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix
2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we
generally do not consider that your age will seriously affect your ability to adjust
to other work. However, in some circumstances, we consider that persons age 45-
49 are more limited in their ability to adjust to other work than persons who have
not attained age 45.  See Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

4

a high of forty-six thousand eight hundred twelve dollars and fifteen cents ($46,812.15) in 2004. (Tr. 152). Her total earnings during those twenty-seven (27) years were four hundred forty-five thousand seventy-one dollars and eighty-four cents ($445,071.84). (Tr. 152).

Plaintiff's alleged disability onset date is June 15, 2011. (Tr. 30, 171). The impetus for her claimed disability is Bipolar Disorder Type II. (Tr. 174).

In a document entitled "Function Report - Adult" filed with the SSA in July of 2011, Plaintiff indicated that she lived in a house with her family, and that she took care of her children and animals. (Tr. 191-192). From the time she woke up until the time she went to bed, Plaintiff stated that she "actually [slept] a majority of the day. . ." (Tr. 192). She stated that, "Anxiety [was] a huge issue for [her because her] bipolar [disease had] created a feeling of helplessness and hopelessness in [her] everyday activities [and she] had thought of suicide on a regular basis . . . [and that she] tried to work [but was prevented by] her illness and state of mind." (Tr. 191). She indicated that her husband did everything at home and "pre-planned for everything for when he [was] at work." (Tr. 192). She stated that her illness has affected her ability to care for herself and her children, to maintain her house, and to hold a job, and that her medications made her "sleep all the time." (Tr. 192). Plaintiff was able to prepare her own meals, but had a

diminished interest in doing so due to loss of focus, even though she loved to cook before her illness began.  (Tr. 193).  Plaintiff was also able to load the dishwasher, do one (1) load of laundry per week, drive a car, and shop for groceries with her husband.  (Tr. 193-194).  When asked to check items that her illness, injuries, or conditions did not affect, Plaintiff did not check lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, seeing, or using hands.  (Tr. 195).

Regarding her concentration and memory, Plaintiff needed reminders to shower, take her medicine, and complete her chores.  (Tr. 192-193).  She could pay bills, count change, handle a savings account, and use a checkbook.  (Tr. 194).  Plaintiff was able to pay attention for "30 minutes or so" and was not able to finish what she started.  (Tr. 195).  She stated she followed spoken instructions "not well at all [because she couldn't] focus" and that she followed written instructions "ok" as she would re-read something until she understood it.  (Tr. 195).  She did not handle stress well as she would usually throw up from anxiety and stress.  (Tr. 196).  She was "ok with changes" in routine.  (Tr. 196).

Socially, Plaintiff went outside everyday, and was able to go out alone most of the time.  (Tr. 194).  Plaintiff had a hard time maintaining friendships because she "was easily hurt or just moody."  (Tr. 195).  She got along "fine" with

6

authority figures, and had never been fired or laid off from a job because of

problems getting along with other people.  (Tr. 196).  She noted that she was

afraid that one (1) day she would kill herself due to her thoughts of self-

worthlessness.  (Tr. 196).  Her medications listed included Cymbalta, Abilify,

Trazadone, and Lamictal.  (Tr. 197).

At her hearing, Plaintiff testified that since she completed the Adult

Function Report, her husband did ninety-five (95) percent of the grocery shopping,

did all the laundry, cooked, and left her a list of chores to motivate her to get out

of bed.  (Tr. 75, 83).  She avoided driving because that is when her panic attacks

occurred, so she would have her husband drive her when he could.  (Tr. 65).  Her

typical day included excessive amounts of sleep, including during the day when

her children were at school, and eating mainly at dinnertime, but also sometimes

during the day.  (Tr. 82).

In terms of vacation, she testified that she drove to Kansas with her

youngest son in approximately March of 2011, and visited family there for two (2)

weeks.  (Tr. 68-69).  The drive to Kansas took two (2) days.  (Tr. 69).  Plaintiff

also admitted that she went on a vacation for one (1) week to Williamsburg in the

summer of 2011.  (Tr. 78).  On this vacation, Plaintiff testified that she and her

family toured Williamsburg for about two and a half (2 ½) hours, but Plaintiff cut

the tour short because she was feeling anxious.  (Tr. 78-79).  Plaintiff stated she
and her family spent most of their time at the pool during this vacation.  (Tr. 78-
79).

Plaintiff also testified about her work and school history.  She stated that the
last time she worked was for two (2) weeks as a customer service representative,
and it was a "nightmare" because the training did not prepare her for the job, and
she had constant thoughts running through her head that made it hard to focus.
(Tr. 70).  She could not remember what she was supposed to do, and she "kept
making the same mistakes."  (Tr. 71).  Plaintiff did not look for another job
because she "was so upset and devastated and felt worthless from trying so hard to
work and provide for [her] family."  (Tr. 71).  She felt she could not work because
her "anxiety [got] the best of [her] when [she was] expected to do something, like
expected to be somewhere at a certain time . . ."  (Tr. 71).  She "hurt herself"
before or during work to get out of having to work due to the anxiety "of knowing
and having the pressure on [her]."  (Tr. 71).  Plaintiff's work history included
working in the IT department from 1999 to 2004, and as a customer service
representative at Bank of America from 2006 to 2010.  (Tr. 71-72).  Plaintiff
testified that in approximately 2010, she earned eighteen (18) credits at
Lackawanna College, and made the Dean's List.  (Tr. 77-78).  Plaintiff stated that

8

she was not physically limited in her ability to work, that her husband's two (2) business endeavors in the radio industry were her family's source of income, and that she helped her husband with his business one (1) day a week, day and night, with data entry and connecting testing. (Tr. 62-63, 67).

In terms of finances, Plaintiff admitted that she had filed for bankruptcy in 2011, had her car repossessed, and that she and her family were still having financial difficulties. (Tr. 67). She testified that she would excessively spend money when going through a manic stage of her Bipolar Depression, but that she hadn't had a manic episode like this "for a while." (Tr. 81).

Regarding her children, at the time of her alleged onset date, Plaintiff's two (2) adopted sons were ages six (6) and four (4), and she acknowledged that she took care of them. (Tr. 64). At the time of the hearing, her sons were ages eight (8) and six (6), and they were in school full-time. (Tr. 64). In terms of childcare, Plaintiff testified that her sons attended a summer camp for three (3) hours each day the summer prior to the hearing. (Tr. 72). Her husband drove them to camp, and she walked to pick them up and took care of them for the remainder of the day. (Tr. 72). She admitted to being friendly with her neighbors, and that they helped her with taking care of her kids by letting her sons play with their children during the summer. (Tr. 73-74).

9

With regards to treatment, Plaintiff admitted that two (2) medication changes and counseling that she was attending every two (2) weeks was helping her feel "a little better." (Tr. 66, 74-75).  She stated that at the time of the hearing, her panic attacks had settled down, and that she hadn't had any "as of lately." (Tr. 65-66).  However, she also testified that she experienced morbid thoughts and "hurting other people to get out of doing things." (Tr. 79).  She testified that at least ten (10) times over the past few years, she hurt herself to "get out of doing things" or to leave early, including slamming her arm in a door, throwing herself down the stairs, and burning herself.  (Tr. 80).

## MEDICAL RECORDS

Before the Court addresses the ALJ's decision and the arguments of counsel, Plaintiff's relevant mental health medical records will be reviewed in detail, beginning with records from his alleged disability onset date of June 15, 2011 through the date of the ALJ's decision on February 4, 2013.

On July 29, 2011, Plaintiff had an appointment with Matthew Berger, M.D. (Tr. 550).  Plaintiff reported that she had been doing well, and was unaccompanied at her appointment.  (Tr. 550).  She stated that she had to leave her job after two (2) weeks of training because "'it was too much,'" that she had been anxious, unable to focus, and more irritable, that her mood had declined since she stopped

10

working, and that she had poor focus.  (Tr. 550).  She reported having financial

issues that were leading to filing for bankruptcy.  (Tr. 550).  She had not been

experiencing mania, mood swings, impulsivity, excessive spending habits, or

suicidal or homicidal ideations.  (Tr. 550).  She admitted to having morbid

thoughts, and that Trazadone had not been as effective for sleep anymore leading

to mild daytime fatigue.  (Tr. 550).  Her therapy with Tina had been very helpful.

(Tr. 550).  Plaintiff denied the following: expansive mood; grandiosity;

overtalkativness; pressured speech; decreased need for sleep; homicidal or suicidal

thoughts; indecisiveness; and sleep problems.  (Tr. 550).  She experienced the

following: ongoing racing thoughts; increased anxiety; increased anhedonia; a

good appetite; poor concentration; increased crying; frequent distractability; fair

energy level, memory, and motivation; increased feelings of guilt; decreased

feelings of helplessness; infrequent impulsiveness; good interest; more frequent

irritability; more frequent isolative behavior; mood lability; being easily

overwhelmed; frequent ruminations; increased sadness; and frequent feelings of

worthlessness.  (Tr. 550).  She had symptoms present for years with a gradual

onset with no precipitating event, and these symptoms had worsened to a moderate

level of severity since her last visit.  (Tr. 550).  Her symptoms were aggravated by

lack of sleep and stress, and alleviated by rest and medications.  (Tr. 550).  Her

medications list at this appointment included Abilify, Metformin, Cymbalta, Enalapril Maleate, Protonix, Simvastatin, Lamictal, and Trazodone.  (Tr. 552). Her exam revealed a cooperative attitude, an affect appropriate to mood, good eye contact, clear and fluent speech, coherent and logical thought processes, intact associative thinking, lack of delusions or hallucinations, a presence of suicidal thoughts, a lack of homicidal thoughts, intact memory, normal attention span and concentration, impulsive judgment, lack of insight, and knowledge and vocabulary consistent with her education.  (Tr. 552).  Her assessment noted that her mood swings were stable, and that her anxiety and depression were exacerbated and related to situational stressors.  (Tr. 552).  Her treatment plan included increasing Lamictal and Trazodone, and to return in four (4) weeks for a follow-up visit.  (Tr. 552).

August 19, 2011, Mark Hite, M.D. performed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment of Plaintiff.  (Tr. 106-114).  Both assessments were current and took into consideration the entire medical record.  (Tr. 106-114).  In the PRT, Dr. Hite considered Listings 12.04[7], Affective Disorders, and 12.08, Personality Disorders.

---

7. Listing 12.04, Affective Disorders, consists of paragraph A criteria that involves a set of medical findings, paragraph B criteria that involves a set of impairment-related functional limitations, and paragraph C criteria that involves a

(Tr. 110).  Dr. Hite opined that, based on a review of the complete medical record, Plaintiff had no restrictions in her activities of daily living, had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and had no repeated episodes of decompensation.  (Tr. 110). Therefore, in Dr. Hite's opinion, the "B" criteria for these impairments Listing was not met.  (Tr. 110).  Dr. Hite also opined that Plaintiff did not meet the "C" criteria for these Listing.  (Tr. 110).  In the "Additional Explanation" section, Dr. Hite stated the following:

---

set of additional functional limitations.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).  The required level of severity for Listing 12.04 is met when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  The paragraph B requirements of Listing 12.04 requires two (2) of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B).  Listing 12.04 paragraph C requires demonstration of a medically documented history of a chronic affective disorder of at least two (2) years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medical or psychosocial support, and one (1) of the following: (1) repeated and extended episodes of decompensation; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one (1) or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C)(1)-(3).

> Dx: Bipolar D/O Type I, NOS; Personality D/O, NOS.
> [Plaintiff] receives psychiatric care with meds with Matthew
> Berger, M.D., and is engaged in therapy.  Records indicate that
> [Plaintiff] is responding well to treatment and has a relatively
> normal MSE over the past several visits (GAF ranging from 56
> to 73).  Her moods have been stable, anxiety and depression
> improved.  It appears that [Plaintiff] has returned to work (note
> 5/27/2011).  No recent IP psych, no current S/HI, plans or
> intent; she contracts consistently for safety.

(Tr. 110).  In the Mental RFC, Dr. Hite opined that while Plaintiff had a medically

determinable impairment that could reasonably be expected to produce her

symptoms, her statements about the intensity, persistence, and functionally

limiting effects of the symptoms could not be substantiated by the objective

medical evidence alone.  (Tr. 111).  He also opined that Plaintiff: (1) did not have

limitations with her memory or understanding; (2) had sustained concentration and

persistence limitations, with her ability to maintain attention and concentration for

extended periods being moderately limited, but no significant limitations in her

ability to carry out short and simple instructions, to carry out detailed instructions,

to perform activities within a schedule, to maintain regular attendance, to be

punctual within customary tolerances, to sustain an ordinary routine without

special supervision, to work in coordination with or in proximity to others without

being distracted by them, to make simple work-related decisions, or to complete a

normal workday and workweek without interruptions from psychologically based

14

symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) had limitations in social interactions as she was moderately limited in her ability to interact appropriately with the general public, but otherwise was not significantly limited in her ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, or to adhere to basic standards of neatness and cleanliness; and (4) had no adaption limitations.  (Tr. 112-114).  Dr. Hite opined that Plaintiff was capable of performing most routine activities of daily living and self-care because she was able to prepare easy meals, do laundry and light chores, drive, go out alone, shop, pay bills, use a checkbook, follow instructions, and manage changes in routine. (Tr. 114).

On September 26, 2011, Lee T. Besen, M.D. performed a consultative examination of Plaintiff.  (Tr. 509).  Plaintiff explained to Dr. Besen that she was diagnosed with Bipolar Disease in 1999, had tried various medications, was misdiagnosed for "a quite period of time," and was a patient of Dr. Berger for the past four (4) years.  (Tr. 509).  She was intelligent, and was able to fully discuss her issues.  (Tr. 509).  She had not had any manic phases for many years, but was

more depressed as she was "down, crying, and regularly anhedonic just as not enjoying anything." (Tr. 509). She had occasional suicidal thoughts with no plans. (Tr. 509). She had her medicines switched multiple times, wanted to sleep all the time, and had no energy. (Tr. 509). She worked as a certified nurse's assistant until February of 2011 when she felt she was "unable to maintain task, [had] no focus, [was] fatigue[d], [and felt] sleepy and just unable to perform her functions." (Tr. 509). Dr. Besen noted, "Other than her psychology type review of systems [Plaintiff had] normal sensorium, [was] able to discuss issues at hand, [had] normal judgment, [and her] remote and recent memory [were] fine." (Tr. 509). Her listed medications included Trazadone, Cymbalta, Metformin, Vasotec, Abilify, Protonix, Simvastatin, Lamictal, and laxative pills. (Tr. 510). Dr. Besen's impression was that Plaintiff had Bipolar Disease with residual depressive symptoms, and impaired fasting sugar due to psychotropics. (Tr. 511). Dr. Besen completed a Medical Source Statement of Plaintiff's ability to perform work-related physical activities. (Tr. 513). He opined that Plaintiff could frequently lift and carry up to twenty (20) pounds, could occasionally lift and carry twenty-five (25) pounds, and had no limitations in standing, walking, sitting, pushing and pulling or any other physical functions. (Tr. 513-514). Plaintiff could frequently bend, kneel, stoop, crouch, balance, and climb, and had no environmental

16

restrictions.  (Tr. 514).

On October 20, 2011, Plaintiff had an appointment with Dr. Berger.  (Tr. 546).  Plaintiff attended the appointment unaccompanied and stated that she had been feeling well.  (Tr. 546).  She reported that she had three (3) panic attacks in the last month and was more anxious and irritable due to financial issues and having to file for bankruptcy, but that overall her mood had been "even" with no mania or impulsivity.  (Tr. 546).  She rated her mood at a six (6) out of ten (10), and admitted to having morbid thoughts.  (Tr. 546).  She had been seeing a counselor named Tina for therapy, which had been helpful.  (Tr. 546).  In the patient "History of the Present Illness" section, it was noted that Plaintiff reported symptoms of Bipolar Disorder, including increased anxiety, racing thoughts, crying episodes, increased feelings of guilt, frequent irritability, frequent distractability, more frequent isolative behavior, mood lability, feeling easily overwhelmed, ongoing ruminations, increased sadness, and frequent feelings of worthlessness.  (Tr. 546).  She denied experiencing grandiosity, overtalkativeness, pressured speech, a decreased need for sleep, a poor appetite, and the presence of homicidal and suicidal thoughts.  (Tr. 546).  She reported that her level of anhedonia had improved, her ability to concentrate, memory, motivation, and energy level were fair, and her feelings of helplessness had decreased.  (Tr. 546).

17

Her symptoms were reported as being a gradual onset with no precipitating event, were moderate in severity, had been present for years with no change since her last visit, and were alleviated by medications and rest.  (Tr. 546).  Her suicide attempts included jumping out of a car in 2000 and cutting her wrists, but these were noted as being attention seeking attempts, not true attempts.  (Tr. 546).  Her previous psychiatric admissions occurred in 1999 and 2000 for severe anxiety.  (Tr. 546). Her exam revealed that she was cooperative and anxious, and had an appropriate mood, good eye contact, clear, fluent and spontaneous speech, intact language processing, a coherent and logical thought process, intact associative thinking, intact immediate, recent, and remote memory, normal concentration and attention span, impulsive judgment, appropriate insight, and knowledge and vocabulary consistent with her education.  (Tr. 548).  Her previous medications included Prozac, which worked well, but that she stopped taking after seven (7) to eight (8) months of treatment.  (Tr. 546).  She had also tried Topamax, Neurontin, Zoloft, Effexor, Elavil, Seroquel, and Tegretol.  (Tr. 546).  The medications she was taking at the time of the appointment included Trazodone, Abilify, Metformin, Cymbalta, Enalapril Maleate, Protonix, Simvastatin, and Lamotrigine.  (Tr. 548). Her assessment noted that her anxiety was exacerbated and related to situational stressors including marriage and workplace problems, that her depression was

18

improved and was related to situational stressors, and that her mood swings were

stable.  (Tr. 548).  Plaintiff's Axis I diagnosis was Bipolar Disorder, not otherwise

specified, her Axis II diagnosis was Personality Disorder, not otherwise specified,

and her Global Assessment of Functioning Score ("GAF")[8] was a fifty-two (52).

---

8. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness.  American Psychiatric Association (2000).  Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.).  Washington, DC: Author.  A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range.  Id.  The score is useful in planning treatment and predicting outcomes.  Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning.  The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  Id.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  Id.  A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  Id.  Recently, the American Psychiatric Association no longer uses the GAF score for assessment of mental disorders due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed.  Solock v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014) (citing Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16, 2014)); See Am.

(Tr. 548).  Her treatment plan included increasing her Cymbalta dose, and to return to the office in four (4) weeks.  (Tr. 549).

On November 18, 2011, Plaintiff had an appointment with Dr. Berger.  (Tr. 738).  Plaintiff attended her appointment unaccompanied.  (Tr. 738).  She reported that she was feeling "a little better," that her mood had improved with medication changes, that she was less irritable, that her mood had been "even," and that seeing Tina for therapy had been very helpful.  (Tr. 738).  She had been feeling fatigued, anxious, and easily overwhelmed, and had morbid thoughts, but she had not had any panic attacks or experienced mania or impulsivity.  (Tr. 738).  She denied experiencing the following: expansive mood, grandiosity, overtalkativeness, pressured speech, decreased need for sleep, presence of homicidal and suicidal ideations, indecisiveness, increased sadness, or sleep problems.  (Tr. 738).  She reported that she had the following: frequent flight of ideas, ongoing racing thoughts, improved anhedonia, improved anxiety, good appetite, fair energy level,

_____

Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 5d, 16 (2013).  As a result, the SSA permits ALJs to use the GAF score as opinion evidence when analyzing disability claims involving mental disorders; however, a "GAF score is never dispositive of impairment severity," and the ALJ, therefore, should not "give controlling weight to a GAF from a treating source unless it is well[-]supported and not inconsistent with other evidence."  SSA AM-13066 at 5 (July 13, 2013).

motivation, memory, and ability to concentrate, decreased crying episodes,

frequent distractability, ongoing feelings of guilt, decreased feelings of

helplessness, infrequent impulsiveness, good interest, less frequent irritability,

more frequent isolative behavior, mood lability, ongoing sadness, ongoing

ruminations, and feelings of worthlessness.  (Tr. 738).  It was noted that she had

improved since her last visit.  (Tr. 738).  Her medications list included Cymbalta,

Lamictal, Trazodone, Abilify, Metformin, Enalapril Maleate, Protonix, and

Simvastatin.  (Tr. 740).  An exam revealed the that Plaintiff had anxiety, an affect

appropriate to her mood, good eye contact, clear and fluent speech, intact language

processing, coherent and logical thought processes, intact associative thinking, no

delusions or hallucinations, intact memory, normal attention span and

concentration, impulsive judgment, appropriate insight, and knowledge and

vocabulary consistent with her education.  (Tr. 740).  Plaintiff's Axis I diagnosis

was Bipolar Disorder, her Axis II diagnosis was personality disorder, and her GAF

was a fifty-two (52).  (Tr. 740).  Her treatment plan involved continuing her

current medications, and returning to the office in eight (8) weeks.  (Tr. 741).

On January 18, 2012, Plaintiff had an appointment with Dr. Berger, which

she attended alone.  (Tr. 742).  Plaintiff stated she was doing better, and that she

was "doing well with [her] current education."  (Tr. 742).  She reported that her

mood was fairly even, and that she was not experiencing mania, impulsivity, or

irritability.  (Tr. 742).  Her anxiety was mild, and she had not had any panic

attacks.  (Tr. 742).  She had been unable to attend therapy with Tina due to

finances.  (Tr. 742).  She rated her mood at a five (5) to six (6) out of ten (10), and

reported that she continued to have morbid thoughts, but no suicidal or homicidal

ideations.  (Tr. 742).  Plaintiff denied expansive mood, gradiosity,

overtalkativeness, pressured speech, decreased need for sleep, decreased crying

episodes, presence of homicidal or suicidal thoughts, and sleep problems.  (Tr.

742).  She reported that she had the following: frequent flight of ideas, ongoing

racing thoughts, improved anhedonia, improved anxiety, good appetite, fair energy

level, motivation, memory, and ability to concentrate, decreased crying episodes,

frequent distractability, ongoing feelings of guilt, decreased feelings of

helplessness, infrequent impulsiveness, good interest, less frequent irritability,

more frequent isolative behavior, mood lability, ongoing sadness, ongoing

ruminations, and feelings of worthlessness.  (Tr. 742).  It was noted that her

condition had not changed since her last visit.  (Tr. 742).  Her medications list

included Cymbalta, Lamictal, Trazodone, Abilify, Metformin, Enalapril Maleate,

Protonix, and Simvastatin.  (Tr. 744).  An exam revealed that Plaintiff had anxiety,

an affect appropriate to her mood, good eye contact, clear and fluent speech, intact

22

language processing, coherent and logical thought processes, intact associative

thinking, no delusions or hallucinations, intact memory, normal attention span and

concentration, impulsive judgment, appropriate insight, and knowledge and

vocabulary consistent with her education.  (Tr. 744).  Plaintiff's Axis I diagnosis

was Bipolar Disorder, her Axis II diagnosis was personality disorder, and her GAF

was a fifty-two (52).  (Tr. 744).  Her treatment plan involved continuing her

current medications, and returning to the office in twelve (12) weeks.  (Tr. 745).

On April 18, 2012, Plaintiff had a follow-up appointment with Dr. Berger

and attended the appointment alone.  (Tr. 746).  Plaintiff reported that she had

been feeling "'not the greatest,'" that she had been down for the last month, that

she hadn't left the house, and that she hadn't felt stable since before Christmas.

(Tr. 746).  She stated she had been experiencing a low mood, fatigue, racing

thoughts, anxiety, and some panic attacks, but that she had not been experiencing

mania, impulsivity, or irritability.  (Tr. 746).  Plaintiff denied expansive mood,

gradiosity, overtalkativeness, pressured speech, decreased need for sleep, presence

of homicidal or suicidal thoughts, and sleep problems.  (Tr. 746).  She reported

that she had the following: frequent flight of ideas, ongoing racing thoughts,

worsened anhedonia, increased anxiety, good appetite, fair memory, motivation,

and ability to concentrate, poor energy levels, increased crying episodes, frequent

distractability, ongoing feelings of guilt, decreased feelings of helplessness, infrequent impulsiveness, good interest, less frequent irritability, more frequent isolative behavior, mood lability, increased sadness, ongoing ruminations, and feelings of worthlessness. (Tr. 746). It was noted her condition had not changed since her last visit. (Tr. 742). Her medications list included Cymbalta, Lamictal, Trazodone, Abilify, Metformin, Enalapril Maleate, Protonix, and Simvastatin. (Tr. 747). An exam revealed the that Plaintiff had anxiety and sadness, an affect appropriate to her mood, good eye contact, clear and fluent speech, intact language processing, coherent and logical thought processes, intact associative thinking, no delusions or hallucinations, intact memory, normal attention span and concentration, impulsive judgment, appropriate insight, and knowledge and vocabulary consistent with her education. (Tr. 747-748). Plaintiff's Axis I diagnosis was Bipolar Disorder, her Axis II diagnosis was personality disorder, and her GAF was a fifty-two (52). (Tr. 748). Her treatment plan involved increasing her Cymbalta dose, adding Klonopin, and returning to the office in four (4) weeks. (Tr. 748).

On May 18, 2012, Plaintiff had an appointment with Dr. Berger, and attended this appointment alone. (Tr. 749). She reported that she was "'about the same,'" did not have too much improvement in mood with the increased Cymbalta,

had ongoing depression and anxiety, had a poor energy level with "'no

motivation,'" and was seeing Tina again for therapy, which had been helpful.  (Tr.

749).  Her sleep and appetite were ok.  (Tr. 749).  She rated her mood at a four (4)

out of ten (10).  (Tr. 749).  She admitted to morbid thinking with occasional

thoughts of suicide, but no intent or plan.  (Tr. 749).  Plaintiff denied expansive

mood, gradiosity, overtalkativeness, pressured speech, decreased need for sleep,

presence of homicidal or suicidal thoughts, and sleep problems.  (Tr. 749).  She

reported that she had the following: frequent flight of ideas, ongoing racing

thoughts, worsened anhedonia, increased anxiety, good appetite, fair memory,

motivation, and ability to concentrate, poor energy levels, increased crying

episodes, frequent distractability, ongoing feelings of guilt, decreased feelings of

helplessness, infrequent impulsiveness, good interest, less frequent irritability,

more frequent isolative behavior, mood lability, increased sadness, ongoing

ruminations, and feelings of worthlessness.  (Tr. 749).  It was noted that her

condition had not changed since her last visit.  (Tr. 749).  Her medications list

included Klonopin, Cymbalta, Lamictal, Trazodone, Abilify, Metformin, Enalapril

Maleate, Protonix, and Simvastatin.  (Tr. 751).  An exam revealed the that Plaintiff

had anxiety and sadness, an affect appropriate to her mood, good eye contact, clear

and fluent speech, intact language processing, coherent and logical thought

processes, intact associative thinking, no delusions or hallucinations, intact

memory, normal attention span and concentration, impulsive judgment,

appropriate insight, and knowledge and vocabulary consistent with education.  (Tr.

751).  Plaintiff's Axis I diagnosis was Bipolar Disorder, her Axis II diagnosis was

personality disorder, and her GAF was a fifty-two (52).  (Tr. 751).  Her treatment

plan involved increasing her Lamictal dose, and returning to the office in four (4)

weeks.  (Tr. 752).

On June 7, 2012, Plaintiff had an appointment with Dr. Berger, which she

attended alone.  (Tr. 753).  She reported that she was "'about the same,'" was

irritable, depressed, and easily overwhelmed, had a poor energy level and

motivation, and that her sleep and appetite were ok.  (Tr. 753).  She admitted to

having morbid thoughts with occasional thoughts of suicide, but no intent or plan.

(Tr. 753).  She noted that therapy with Tina had been helpful.  (Tr. 753). Plaintiff

denied expansive mood, gradiosity, overtalkativeness, pressured speech, decreased

need for sleep, presence of homicidal or suicidal thoughts, and sleep problems.

(Tr. 753).  She reported that she had the following: frequent flight of ideas,

ongoing racing thoughts, worsened anhedonia, increased anxiety, good appetite,

fair memory and ability to concentrate, poor energy levels and motivation,

ongoing crying episodes, frequent distractability, ongoing feelings of guilt,

decreased feelings of helplessness, infrequent impulsiveness, good interest, less frequent irritability, more frequent isolative behavior, mood lability, increased sadness, ongoing ruminations, suicidal thoughts, and feelings of worthlessness. (Tr. 753).  It was noted that her condition had not changed since her last visit.  (Tr. 753).  Her medications list included Cymbalta, Lamictal, Trazodone, Abilify, Metformin, Enalapril Maleate, Protonix, and Simvastatin.  (Tr. 755).  An exam revealed the that Plaintiff displayed sadness and a subdued mood, an affect appropriate to her mood, good eye contact, clear and fluent speech, intact language processing, coherent and logical thought processes, intact associative thinking, no delusions or hallucinations, intact memory, normal attention span and concentration, impulsive judgment, appropriate insight, and knowledge and vocabulary consistent with her education.  (Tr. 755).  Plaintiff's Axis I diagnosis was Bipolar Disorder, her Axis II diagnosis was personality disorder, and her GAF was a fifty-two (52).  (Tr. 755).  Her treatment plan involved increasing her Abilify and Lamictal doses, adding Benztropine, and returning to the office in three (3) weeks.  (Tr. 756).

On July 27, 2012, Plaintiff had an appointment with Dr. Berger, and attended this appointment alone.  (Tr. 757).  Plaintiff reported increasing frustration and irritability, and remained easily overwhelmed.  (Tr. 757).  She

admitted to an increase in morbid thinking about hurting someone, although she

stated she never would hurt someone.  (Tr. 757).  She denied any physical

aggression with her children, but admitted to occasional thoughts of suicide with

no intent or plan.  (Tr. 757).  Therapy with Tina had been helpful.  (Tr. 757).

Plaintiff denied expansive mood, gradiosity, overtalkativeness, pressured speech,

decreased need for sleep, presence of homicidal or suicidal thoughts, and sleep

problems.  (Tr. 757).  She reported that she had the following: frequent flight of

ideas, ongoing racing thoughts, worsened anhedonia, increased anxiety, good

appetite, fair memory, motivation, and ability to concentrate, poor energy levels,

increased crying episodes, frequent distractability, ongoing feelings of guilt,

decreased feelings of helplessness, infrequent impulsiveness, good interest, less

frequent irritability, more frequent isolative behavior, mood lability, increased

sadness, ongoing ruminations, and feelings of worthlessness.  (Tr. 757).  It was

noted that her condition had not changed since her last visit.  (Tr. 757).  Her

medications list included Cymbalta, Lamictal, Trazodone, Abilify, Metformin,

Enalapril Maleate, Prilosec, Benztropine Mesylate, and Simvastatin.  (Tr. 759).

An exam revealed that Plaintiff displayed sadness and a subdued mood, an affect

appropriate to her mood, good eye contact, clear and fluent speech, intact language

processing, coherent and logical thought processes, intact associative thinking, no

28

delusions or hallucinations, intact memory, normal attention span and concentration, impulsive judgment, appropriate insight, and knowledge and vocabulary consistent with her education. (Tr. 759). Plaintiff's Axis I diagnosis was Bipolar Disorder, her Axis II diagnosis was personality disorder, and her GAF was a fifty (50). (Tr. 759). Her treatment plan involved tapering and discontinuing Abilify, adding Latuda, decreasing Cymbalta, and returning to the office in three (3) weeks. (Tr. 760).

On August 16, 2012, Plaintiff went unaccompanied to her appointment with Dr. Berger. (Tr. 761). She reported that she was "'about the same,'" and was experiencing ongoing irritability, frustration, and morbid thoughts of suicide without intent or plan. (Tr. 761). Plaintiff denied expansive mood, gradiosity, overtalkativeness, pressured speech, decreased need for sleep, presence of homicidal or suicidal thoughts, and sleep problems. (Tr. 761). She reported that she had the following: frequent flight of ideas, ongoing racing thoughts, worsened anhedonia, increased anxiety, good appetite, fair memory, motivation, and ability to concentrate, poor energy levels, increased crying episodes, frequent distractability, ongoing feelings of guilt, decreased feelings of helplessness, infrequent impulsiveness, good interest, less frequent irritability, more frequent isolative behavior, mood lability, increased sadness, ongoing ruminations, and

feelings of worthlessness.  (Tr. 761).  It was noted that her condition had not

changed since her last visit.  (Tr. 761).  Her medications list included Benztropine

Mesylate, Klonopin, Lamictal, Trazodone, Metformin, Cymbalta, Enalapril

Maleate, simvastatin, Prilosec, and Latuda.  (Tr. 763).  An exam revealed that

Plaintiff displayed sadness and a subdued mood, an affect appropriate to her

mood, good eye contact, clear and fluent speech, intact language processing,

coherent and logical thought processes, intact associative thinking, no delusions or

hallucinations, intact memory, normal attention span and concentration, impulsive

judgment, appropriate insight, and knowledge and vocabulary consistent with

education.  (Tr. 763).  Plaintiff's Axis I diagnosis was Bipolar Disorder, her Axis

II diagnosis was personality disorder, and her GAF was fifty (50).  (Tr. 763).  Her

treatment plan involved increasing Latuda, continuing her other medications,

attending therapy with Tina, and returning to the office in two (2) weeks.  (Tr.

764).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence."  Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the RFC to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's RFC.  Id.  If the claimant has the RFC to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).  RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The RFC assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'[RFC]' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]. "  Poulos, 474 F.3d at 92,

citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016.  (Tr. 32). The ALJ then proceeded through each step of the sequential evaluation process and determined that Plaintiff was not disabled.  (Tr. 32).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of June 15, 2011.  (Tr. 32).

At step two, the ALJ determined that Plaintiff suffered from the severe[9] combination of impairments of the following: "bipolar disorder and personality disorder (20 C.F.R. 404.1520(c))."  (Tr. 32).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

---

9.  An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).  (Tr. 33).

At step four, the ALJ determined that Plaintiff had RFC to perform a full

range of work at all exertional levels with the following nonexertional limitations:

> [Plaintiff] is limited to occupations requiring no more than
> simple, routine tasks, not performed in a fast-paced
> environment, involving only simple, work-related decisions,
> and in general, relatively few work place changes.  [Plaintiff] is
> limited to occupations, which require no more than occasional
> interaction with supervisors and coworkers and no interaction
> with members of the general public, although she can be in
> proximity to the public. [Plaintiff] is limited to occupations,
> which require low stress, defined as occasional decision
> making required.

(Tr. 34-35).

At step five of the sequential evaluation process, considering the Plaintiff's

age, education, work experience, and RFC, the ALJ determined "there are jobs that

exist in significant numbers in the national economy that the [Plaintiff] can

perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))."  (Tr. 40).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between the alleged onset date of June 15,

2011 through the date of the ALJ's decision.  (Tr. 41).

## DISCUSSION

In her complaint and brief in support, Plaintiff is alleging that the ALJ erred

in failing to give controlling weight to the opinion of Plaintiff's treating physician,

Dr. Berger.  (Doc. 7, pp. 7, 10-13).  Defendant disputes this contention.  (Doc. 8,

pp. 15-23).

      The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g.,

Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true

when the treating physician's opinion "reflects expert judgment based on a

continuing observation of the patient's condition over a prolonged time."

Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion.").  The factors to be applied to

determine the appropriate weight to be given to the treating physician's opinion

are: (1) length of treatment relationship and frequency of examination, (2) nature

and extent of the treatment relationship, (3) supportability of the opinion by

relevant evidence or explanation, (4) consistency of the opinion with the record as

a whole, (5) whether the treating physician is a specialist, and (6) other factors

which tend to support or contradict the opinion.  See 20 C.F.R. § 416.927(d)(1)-

(d)(6).

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012

U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r

of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

   In his opinion, the ALJ initially gave great weight to the opinion of Dr. Hite

rendered in the PRT and Mental RFC. (Tr. 38). He noted that he gave little

weight to the portion of the opinion that stated Plaintiff had no difficulty in

activities of daily living because the record supported that Plaintiff had mild

difficulty in this area. (Tr. 38). The ALJ also gave great weight to the opinion of

Dr. Besen in that Plaintiff had no limitations in standing, walking, or sitting. (Tr.

38). He gave little weight to the portion of Dr. Besen's opinion that Plaintiff could

only occasionally lift and/ or carry twenty-five (25) pounds maximum because this

"[was] not in line with [Dr. Besen's] essentially normal examination findings."

(Tr. 39). The ALJ then gave great weight to the GAF scores of fifty-two (52) and

fifty-six (56) assigned to Plaintiff in May, July, October, and November of 2011,

and January, April, May, and June of 2012 because they were "consistent with the

medical evidence of record, which show[ed] no more than moderate objective

mental status examination findings during this period[.]" (Tr. 39).

   Little weight was assigned to the GAF score of fifty (50) assigned to

Plaintiff during a two (2) month span in July and August of 2012 because they

were not "clearly supported in the evidence of record." (Tr. 39). The ALJ also

gave little weight to GAF scores assigned to Plaintiff and an opinion rendered by Ms. Margaret Marshall, who was not an acceptable medical source, that Plaintiff had difficulties in social functioning and in concentration persistence, because these were not consistent with the record and were rendered before the alleged onset date.  (Tr. 39-40).  Lastly, the ALJ gave little weight to Dr. Berger's opinion from July of 2011 that Plaintiff had marked difficulties in responding to work changes and understanding, remembering, and carrying out detailed work instructions.  (Tr. 39).  The ALJ stated:

> As was stated above[,] the examinations for this period simply noted a depressed and subdue[d] mood with impulsive judgment.  Further, Dr. Berger consistently as per examination findings noted [Plaintiff's] "attention and concentration" was normal.  She was also was [] oriented times three with immediate, recent and remote memory intact.  She made good eye contact with clear, fluent and spontaneous speech.  Language processing and associative thinking were intact and her thought processes were coherent and logcal.  Surely, such normal mental status examination findings do not equate to "marked" difficulties in these areas.  Accordingly, little weight is afforded by the undersigned to this opinion.

(Tr. 39).  Therefore, the ALJ was explaining that the evidence of record, and Dr. Berger's own examination, did not support his opinion that Plaintiff had marked difficulties in responding to work changes and understanding, remembering, and carrying out detailed work instructions.

Ultimately, the ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels with the following nonexertional limitations: (1) Plaintiff was limited to occupations requiring no more than simple, routine tasks, not performed in a fast-paced production environment, involving only simple, work-related decision, and in general, relatively few work place changes; (2) Plaintiff was limited to occupations that required no more than occasional interaction with supervisors and coworkers and no interaction with, but within general proximity to, members of the general public; and (3) Plaintiff was limited to occupations that required low stress, defined as occasional decision-making required. (Tr. 35-36). Therefore, the ALJ erred on the side of caution in determining Plaintiff's RFC, and included nonexertional limitations regarding social functioning and concentration, persistence, and pace.

Upon review of the record and the ALJ's decision, it is determined that the ALJ appropriately afforded weight to the aforementioned opinions. The opinions of Dr. Hite and Dr. Besen and the GAF scores from May, July, October, and November of 2011 and January, April, May, and June of 2012 were consistent with and well-supported by the medical evidence and record as a whole. As noted by the ALJ, Plaintiff repeatedly told her physicians and testified at her oral hearing that she was doing better, that her anxiety and depression were improving with

41

medications and therapy, and that her panic attacks had settled down.  (Tr. 37, 65-66, 74-75).  Additionally, as noted by the ALJ, Plaintiff testified that she was able to go on vacation to Williamsburg for one (1) week in the summer of 2011, travel to Ohio for Thanksgiving in 2011, prepare meals, shop, attend appointments unaccompanied, take care of her two (2) children, help her husband with his business, socialize with neighbors, and handle savings and checking accounts without difficulty.  (Tr. 38, 64, 68-69, 72-74).

Additionally, it was repeatedly noted by Dr. Berger that Plaintiff's memory was intact, her attention span and concentration were normal, her language processing and associative thinking were intact, her speech was clear, fluent, and spontaneous, her eye contact was good, and her mood swings were stable.  (Tr. 37, 552, 548, 740, 744, 747-748, 751, 755, 759, 763).  Also, as discussed by the ALJ, Plaintiff's treatment was routine and conservative and did not require any inpatient treatment, hospitalizations or emergency room visits.  (Tr. 37).

Moreover, the RFC determined by the ALJ accommodated Plaintiff's limitations as it limited her to simple, unskilled work, with limitations in workplace changes and decision-making and with a limitation of no interaction with the general public, supervisors, or co-workers.  (Tr. 35-37).

As such, based on a review of the record, it is determined that substantial

42

evidence supports the ALJ's RFC determination, and it will not be disturbed on appeal.

## CONCLUSION

The Court's review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), Plaintiff's appeal will be denied, and the decision of the Commissioner denying disability insurance benefits will be affirmed.

A separate Order will be issued.

**Date**: June 1, 2015

/s/ **William J. Nealon**
**United States District Judge**